222 Cal.App.3d 1475 (1990)
272 Cal. Rptr. 489
In re SAMKIRTANA S. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
CLAUDIA S., Defendant and Appellant.
Docket No. D010184.
Court of Appeals of California, Fourth District, Division One.
August 20, 1990.
*1478 COUNSEL
Sandra Bennewitz, under appointment by the Court of Appeal, for Defendant and Appellant.
Edwin L. Miller, Jr., District Attorney, Thomas F. McArdle and Craig E. Fisher, Deputy District Attorneys, for Plaintiff and Respondent.
Sherri Sobel Sokoloff for Minors.
OPINION
WIEN, J.[*]
Claudia S. (Claudia) appeals from an order sustaining a supplemental petition declaring her children Samkirtana S., Dove S., and David S. dependents of the juvenile court and placing them in foster care under the supervision of the department of social services (Welf. & Inst. Code,[1] §§ 300, subd. (a) & 387). Claudia contends that: (1) a written stipulation signed by her counsel to allow the referee to act as a temporary judge was invalid without her express agreement and therefore she was entitled to a review of the orders by a superior court judge; (2) the evidence is insufficient to support the court's order of dependency; (3) the evidence is insufficient to *1479 support the disposition order placing the children outside the home in foster care. Finding no error, we affirm.

PROCEDURAL BACKGROUND
On January 12, 1988, the San Diego County Department of Social Services (the Department) filed dependency petitions pursuant to section 300, subdivision (a) relating to Claudia's children Samkirtana S. (Sam) born November 5, 1978, David, born December 3, 1986, and Dove, born October 23, 1985. The petition alleged that the mother used alcoholic beverages to excess, the father could not protect them and the minors needed the protection of the juvenile court. After a contested hearing on the petition before a superior court judge, the minors were placed in the home of their mother, a reunification plan was ordered and a review hearing was set for August 15, 1988. The review hearing was held as scheduled, at which time a social study was received in evidence and the court continued the prior orders, but further required the mother to submit to drug testing. The next review hearing was set for February 16, 1989.
On February 16, 1989, the Department filed supplemental petitions pursuant to section 387 alleging that previous orders had not been effective in protecting the minors in that on February 11, 1989, the mother used alcoholic beverages to excess rendering her unable to care for her children and on February 14, 1989, she allowed the children to be unattended and unsupervised. At the detention hearing the Department was given discretion to detain the children in the mother's home if the social worker felt the children were safe after consulting with the mother's therapist.
Prior to the contested hearing on the supplemental petitions held on March 10, 1989, the attorney for the minors and the attorney for Claudia signed a written stipulation for the appointment of a juvenile court referee as temporary judge. It stated: "IT IS HEREBY STIPULATED by and between the parties to the above entitled cause that Margie G. Woods, a member of the State Bar of San Diego, California ... may as Temporary Judge, try the above entitled cause and be empowered to act in such capacity in the said cause until the final disposition thereof."
The stipulation was then signed by Referee Margie G. Woods who consented to act as temporary judge. The stipulation was then submitted to the judge of the juvenile court who approved the selection of the named referee as temporary judge. Finally, Referee Woods executed the required oath to act as temporary judge.
At the contested hearing on May 9, 1989, the court ordered the children be continued as dependents of the juvenile court; the custody of the children *1480 was removed from the mother and they were placed in foster homes. Claudia was ordered to comply with a reunification plan and return for a review hearing on November 7, 1989.
Appeal from the orders of May 9, 1989, followed.

DISCUSSION

Validity of the Appointment of Temporary Judge
Claudia contends that the findings of the court on March 10, 1989, and the dispositional orders on May 9, 1989, were ineffective because of noncompliance with California Rules of Court,[2] rule 1416(a)(2),[3] requiring that she be informed of the right to seek review of the orders by a juvenile court judge.
Claudia's argument is premised on the further contention that the stipulation appointing Referee Margie Woods as temporary judge was invalid because Claudia did not personally join in the stipulation. We reject these contentions.
Article VI, section 21 of the California Constitution provides: "On stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause."
Rule 244 specifies the following procedure for appointment of temporary judges: "The stipulation of the parties litigant that a case may be tried by a temporary judge shall be in writing and shall state the name and office address of the member of the State Bar agreed upon. It shall be submitted for approval to the presiding judge, or to the supervising judge of a branch court. The order designating the temporary judge shall be endorsed upon the stipulation, which shall then be filed. The temporary judge shall take and subscribe the oath of office, which shall be attached to the stipulation and order of designation, and the case shall then be assigned to the *1481 temporary judge for trial. After the oath is filed, the temporary judge may proceed with the hearing, trial, and determination of the case.
"A filed oath and order, until revoked, may be used in any case in which the parties stipulate to the designated temporary judge. The stipulation shall specify the filing date of the oath and order.
"This rule does not apply to the selection of a court commissioner to act as a temporary judge."
In this case, the stipulation in the form required by rule 244 was signed by a deputy district attorney representing the Department, by the attorney for the minors and by the attorney for Claudia, the mother. None of the minors or Claudia signed the stipulation. Referee Woods did not inquire whether Claudia understood and agreed to the stipulation.
(1) By stipulation of the parties, "full judicial powers" can be conferred on a qualified referee for the jurisdictional hearing. (In re Perrone C. (1979) 26 Cal.3d 49, 57 [160 Cal. Rptr. 704, 603 P.2d 1300].) When a referee sits as a temporary judge his or her orders become final in the same manner as orders by a permanent judge. (§ 250; rule 1415(b).) Therefore, if the stipulation entered into by Claudia's attorney is effective, rule 1416(a)(2) has no application.
In the recent case of In re Lamonica H. (1990) 220 Cal. App.3d 634 [270 Cal. Rptr. 60], this court dealt with the requirements of rule 244 in a section 300 dependency case. In Lamonica H., no written stipulation permitting the referees to act as temporary judges was ever obtained. The father of the children appealed on the ground that the failure to obtain a written stipulation invalidated the proceedings conducted before the referees. He also contended that he failed to receive notice of his right to a rehearing before a superior court judge as required by rule 1416(a), (b). Relying on In re Robert S. (1988) 197 Cal. App.3d 1260 [243 Cal. Rptr. 459] and rejecting the rationale of conflicting cases, this court held that the absence of a written stipulation did not invalidate proceedings held when the requirements of rule 244 have not been met. In so holding this court concluded, because the requirements of the rule are intended to serve strictly administrative purposes and are not intended for the protection of the parties, therefore the requirements are directory and not mandatory. Finally, we found that an agreement that the referees act as temporary judges was implied from the conduct of the father and his attorney. In that regard we noted that the referees "took steps which were proper only if the parties understood the referees were acting as temporary judges," (Lamonica H., supra, 220 Cal. App.3d at p. 647) including the fact of a knowing failure to give the *1482 notice required by rule 1416(a), (b) and also by the manner in which the court and counsel dealt with disposition.
Unlike the father in Lamonica H., here Claudia does not assert the orders of the court were void nor does she assert that she assumed the presiding officer was a referee. Nor does Claudia complain about not receiving notice of a right to ask for rehearing. Instead, Claudia asserts that she assumed the officer was a permanent superior court judge, not a temporary judge. She contends that the stipulation signed by her attorney allowing Referee Woods to sit as a temporary judge is not binding on her and that she is entitled to a review by a superior court judge pursuant to rule 1416(a), (b).
Since neither Lamonica nor the other cases discussed in Lamonica H. deal with the precise issue here, we must look to cases dealing generally with the authority of an attorney to act on behalf of his client. Claudia cites Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396 [212 Cal. Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109] in support of her argument that her attorney lacked the authority to bind her to a stipulation that the referee act as a temporary judge.
In Blanton, the Supreme Court nullified an arbitration award where the plaintiff's attorney had executed a stipulation providing for binding arbitration. The attorney had entered into the stipulation not only without his client's express authority but contrary to her express instructions.
In denying the attorney's authority to bind his client, the court distinguished between the attorney's authority in procedural matters and those involving substantial or fundamental rights: "The authority thus conferred upon an attorney is in part apparent authority  i.e., the authority to do that which attorneys are normally authorized to do in the course of litigation manifested by the client's act of hiring an attorney  and in part actual authority implied in law. Considerations of procedural efficiency require, for example, that in the course of a trial there be but one captain per ship. An attorney must be able to make such tactical decisions as whether to call a particular witness, and the court and opposing counsel must be able to rely upon the decisions he makes, even when the client voices opposition in open court. [Citation.] In such tactical matters, it may be said that the attorney's authority is implied in law, as a necessary incident to the function he is engaged to perform. [Citations.]
"An attorney is not authorized, however, merely by virtue of his retention in litigation, to `impair the client's substantial rights or the cause of action itself.' [Citation.] For example, `the law is well settled that an attorney must be specifically authorized to settle and compromise a claim, that *1483 merely on the basis of his employment he has no implied or ostensible authority to bind his client to a compromise settlement of pending litigation. [Citations.]' (Whittier Union High Sch. Dist. v. Superior Court (1977) 66 Cal. App.3d 504, 508 [136 Cal. Rptr. 86]; see also Linsk v. Linsk, supra, 70 Cal.2d at p. 278.) Similarly, an attorney may not `stipulate to a matter which would eliminate an essential defense [citation]. He may not agree to the entry of a default judgmen [citation], may not ... stipulate that only nominal damages may be awarded [citation] and he cannot agree to an increase in the amount of the judgment against his client. [Citation.] Likewise, an attorney is without authority to waive findings so that no appeal can be made....' (Linsk v. Linsk, supra, 70 Cal.2d at p. 278; see Bowden v. Green (1982) 128 Cal. App.3d 65, 73-74 [180 Cal. Rptr. 90] [no authority to dismiss cross-complaint].) Such decisions differ from the routine and tactical decisions which have been called `procedural' both in the degree to which they affect the client's interest, and in the degree to which they involve matters of judgment which extend beyond technical competence so that any client would be expected to share in the making of them." (Blanton v. Womancare, Inc., supra, 38 Cal.3d at pp. 404-405.)
Applying the principles enunciated the court stated that binding arbitration entails a waiver of all but minimal judicial review, provides for the unilateral selection of the arbitrator by the defendant's attorney from a list of attorneys whose practice consists primarily in defending medical malpractice cases and waives any right to recover beyond $15,000, consequences affecting substantial rights of the client. The stipulation to arbitrate the court concluded, "... did not constitute a tactical maneuver in pending litigation; rather, it called for a diversion of the dispute from the judicial to the arbitral arena." (38 Cal.3d at p. 407, italics in original.)
In In re Marriage of Helsel (1988) 198 Cal. App.3d 332 [243 Cal. Rptr. 657], this court referred to a third category of rights, neither procedural nor fundamental, "in which the substantive rule is that the lawyer must be authorized by the client to act but in which the nature of the agreement or stipulation is not so substantial that the remedy for breach of the rule should be the setting aside of the agreement...." (Id. at p. 338.) In regard to this category, the court stated: "[W]e reject the suggestion that a client cannot be bound by any unauthorized agreement entered into by a lawyer. Such a rule would effectively require client signature approval for every litigation agreement except those which could be definitively labeled as `tactical' or procedural [citation], thereby adding tremendous transaction costs to a legal system which has already outpriced a substantial segment of society." (Ibid., fn. omitted.)
*1484 Based on this analysis, Helsel approved a stipulation by the attorney involving an increase in child support, attorney's fees and the manner of disbursing a trust fund.
(2) In this case, while the stipulation does not involve a tactical or procedural decision it also does not involve the waiver or compromise of so fundamental a right that justifies setting aside the stipulation entered into without the client's express concurrence. It appears to be within the third category of cases discussed in Helsel. There is no elimination of an essential defense, no agreement to the entry of a default judgment, no compromise of a claim; nor is there any waiver of the right to a trial. Rather, here the effect of the stipulation was simply to bypass judicial review of the findings and orders of a juvenile court referee. When this review is afforded, there is no trial de novo; the court simply reviews the record to decide whether or not to approve the orders.
Our conclusions find support in In re Lamonica H., supra, 220 Cal. App.3d at page 644. There, we considered the duties referees may discharge in juvenile proceedings under section 300 when they are not sitting as temporary judges. We referred to section 248 providing: "`A referee shall hear such cases as are assigned to him or her by the presiding judge of the juvenile court, with the same powers as a judge of the juvenile court except that a referee shall not conduct any hearing to which the state or federal constitutional prohibition against double jeopardy apply unless all of the parties thereto stipulate in writing that the referee may act in the capacity of a temporary judge.'" (Ibid.) We observed in a footnote at pages 644 and 645: "Because civil dependency proceedings under section 300 are designed not to prosecute the parents but to protect the child, generally the double jeopardy prohibitions of the state and federal Constitutions have no application [citation]. On the other hand, proceedings under section 602 do involve double jeopardy and require a stipulation. [Citation.]" We then stated: "Thus even when a parent or child is unwilling to stipulate a referee may act as a temporary judge, the referee may nonetheless conduct juvenile proceedings under section 300. The stipulation is not necessary to empower a referee; it is only necessary to give his acts finality." (Id. at p. 645, italics added.)
The stipulation here that the referee act as a temporary judge may be contrasted with a stipulation that an attorney may sit as a judge in a civil case. In that instance, unlike a section 300 dependency proceeding, the attorney is not empowered to conduct the trial without a valid stipulation. In that case, undoubtedly, the express consent of the client would be required. Since the stipulation here only affects the right to review (and that is all Claudia seeks), and not the right to conduct the hearing, it is reasonable *1485 to conclude that the right to review falls into the third category of rights enunciated in Helsel where the stipulation of the attorney, without the express consent of the client, will not be set aside.
(3) Moreover, it is important to note that there is no evidence in this case that Claudia objected to the stipulation, as in Blanton, supra, or even that the action was unauthorized as in Helsel, supra. Instead, the record is silent as to whether the attorney explained the stipulation to Claudia and obtained her consent. Although it is clear that an attorney may not compromise or surrender a substantial right of the client without his or her express consent, such a rule should not obtain where the right is not substantial and the record is silent. When there is no evidence whether the client understood his or her rights or consented to the attorney's action, and the right involved is not fundamental or substantial, the better rule is to assume that the attorney has fulfilled his obligation to fully advise his client and that the client has agreed to the action. A silent record should not lead to an assumption that the client was not adequately informed on the subject and would have refused to consent had he or she been informed. (See Kohr v. Kohr (1963) 216 Cal. App.2d 516[31 Cal. Rptr. 85].) Given this assumption, Claudia has waived her right to complain about the effect of the stipulation by her participation, without objection, in the several hearings. (See In re Robert S., supra, 197 Cal. App.3d at p. 1265; In re P.I. (1989) 207 Cal. App.3d 316, 322 [254 Cal. Rptr. 774].)

SUFFICIENCY OF THE EVIDENCE
(4a) Claudia argues that there was insufficient evidence to support the allegations concerning the events on February 11 and 14, 1989, and the conclusion of the court that the previous orders have not been effective in her rehabilitation or in the protection of the minor.[4]
Claudia entered a no-contest plea at the time of the hearing on the original section 300, subdivision (a) petition on January 28, 1988. At that time a social study was admitted in evidence.
Included in the social study was an interview with one of the children, Sam, then age nine, who told the social worker that on January 10, 1988, he left home at 3:30 or 4 p.m., was out playing games at the pinball place and that his mother didn't pick him up at 7 p.m., apparently as expected. He related that later he was picked up by his sister's father, taken to the father's house and then to the police station where his brother and sister were. A *1486 baby-sitter, Cheyanne Martin, related to the social worker that on the same date Claudia was drunk and chased her with a knife. She also stated that Claudia dropped Dove on the ground and also dropped a beer and told David, then two years old, to drink it.
Claudia missed a scheduled psychological evaluation for Sam on January 18, 1988, and later told the social worker she did not feel a need for parenting classes.
At the disposition hearing held on May 16, 1988, a supplemental report was admitted in evidence wherein the social worker observed the mother had been meeting her therapist obligations and attending parenting classes but there was still some denial of personal responsibility. There was concern about Dove's sexual behavior. It was recommended that the children be detained with their mother.
Subsequent reports, considered at the time of scheduled review hearings, reported progress. A report dated August 11, 1988, stated that according to the mother's therapist she has been coming regularly to the therapy sessions and seemed to be motivated, but a great deal of denial still existed. The report concluded that the mother is actively pursuing the reunification plan but further time to complete the plan was needed. A report dated February 16, 1989, still showed concern because of the use of denial but observed that Claudia acknowledged the helpfulness of Alcoholics Anonymous, parenting classes and psychotherapy. It was recommended that jurisdiction be terminated. However, on March 1, 1989, supplemental petitions under section 387 were filed.
At the hearing on March 10, 1989, on the supplemental petitions, a social study dated March 1, 1989, was admitted into evidence relating a statement by Sam: "Mom had a beer on February 11, 1989. Mom had slurred speech and she was sleepy." The social worker related that on February 14, 1989, she found Sam at Aracele Rivera's home at around 8:30 p.m. when Rivera stated "The mother did not ask me to watch Sam. Sam has been here with me for two hours. The mother has not called me." The witness also related that Sam comes to her apartment frequently without his mother checking on him. She stated that the mother had been acting strangely the past two weeks. Sam told the social worker that he had not attended school that day or all week.
The social worker also related that she found that the other children were staying with a neighbor, Pat Benuelos, who told her the children had been left with her at 11:20 a.m. Pat expected Claudia to return in two hours but as of 10 p.m. she had not returned nor did she call.
*1487 Janis Wood testified she telephoned Claudia on February 11, 1989. Claudia's voice was slurred and she said she had been drinking all day. Wood said she went to Claudia's apartment and observed Claudia to be really intoxicated and in her opinion was "drunk." When confronted about drinking around the children, Claudia replied "[n]o problem, no problem if I do it here in the house." When asked if the children were being supervised, Wood testified Claudia seemed to be unaware that they were around. Finally, Ms. Wood rendered an opinion that Claudia was not capable of caring for her children that day.
At the hearing Claudia testified she only had two beers on February 11, 1989, and was not intoxicated. As to the events on February 14, 1989, Claudia testified she met a friend, with whom she went to lunch. She ended up spending the evening at a wedding reception with the friend, and returned back at 11 p.m.
She also testified she could not get in touch with the Benueloses and asked a friend, Linda, to tell them she would be late. Linda responded that "she might."
The social study related that Claudia missed appointments for drug testing. The social worker testified that a drug screening test administered February 20, 1989, disclosed the presence of methamphetamine.
(5) In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. (In re Tanya P. (1981) 120 Cal. App.3d 66 [174 Cal. Rptr. 533].) Those findings and orders may not be disturbed if they are supported by substantial evidence. (In re Heather P. (1988) 203 Cal. App.3d 1214 [250 Cal. Rptr. 468]; In re Cheryl H. (1984) 153 Cal. App.3d 1098 [200 Cal. Rptr. 789].) As stated: "Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] `The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" (Id. at p. 1132.)
(4b) With regard to the allegations regarding the mother's drinking to excess on February 11, 1989, the court commented that it was a question of credibility and then weighed the testimony of Ms. Wood against that of the mother, concluding: "So certainly in this Court's eye the mother's friend's testimony is that [sic] more accurate testimony of what was the situation on February 11th, 1989. The mother had been drinking perhaps more than she now wants to admit or recall and in fact she is drunk to the state where *1488 Mrs. Wood, a friend who had supported the mother for quite some time, now felt that her children were in danger and wanted to have the children in her own care until the mother sobered up." The court's conclusion is also supported by the social worker's interview with the nine-year-old child Sam, who stated he saw his mother drinking a beer, that she had slurred speech and was sleepy. Sufficient evidence supported the court's finding regarding excessive consumption of alcohol.
Furthermore, substantial evidence supports the court's conclusions concerning the mother's failure to provide the children with adequate supervision on February 14, 1989. As pointed out by the court the evidence was uncontradicted that the mother left her two younger children with her friend Pam expecting to return in two hours and in fact did not return for twelve hours, choosing instead to attend an unplanned social function until late that night. With regard to Sam, the evidence that she made no arrangements for his care whatsoever is also uncontradicted. The mother's testimony about asking a friend to check on her children was justifiably given little weight by the court.
Finally, substantial evidence supports the court's conclusion that the previous orders of the court were ineffective in protecting the children.
It is reasonable to conclude that when the mother had been drinking all day on February 11th to the point she was drunk and appeared to her friend to be unaware of the presence of her children, she was unable to adequately care for her children.
The effect of the mother's actions on February 14th on the welfare of the children was highlighted by Sam's statement to the social worker that he had not gone to school that day or the entire week. Furthermore, the evidence demonstrated that the lack of supervision on February 14th was not an isolated instance but represented a pattern of neglect.
Since the purpose of the reunification plan was to remedy the problems caused by the mother's alcohol and substance abuse and to instill a sense of responsibility in providing care and supervision for her children, it was reasonable for the court to conclude that the previous orders had been ineffective.

REMOVAL OF THE CHILDREN FROM THE HOME
(6) Substantial evidence supports the findings and order of the court removing the children from the home of the mother and placing them in foster care.
*1489 Before the children may be removed from the custody of their mother, a clear finding must be made that a return of the children to her custody would create a substantial risk of detriment to their physical well-being. (In re Venita L. (1987) 191 Cal. App.3d 1229, 1239 [236 Cal. Rptr. 859].) Appellant concedes that such a finding was made here but argues that the evidence is insufficient to support that finding. We disagree.
First of all, the court properly took into consideration the past history as well as the present circumstances in making the order. (In re Michael S. (1987) 188 Cal. App.3d 1448, 1458 [234 Cal. Rptr. 84].) As stated: "It would be unrealistic under the circumstances of a section 387 supplemental petition to require the department of social services, the probation officer, or the court to mechanistically institute a reunification plan without regard to the family's prior history. Such a requirement could conceivably result in an endless cycle of `successful' reunification, resulting in return of a dependent child to parental custody, only to have the child reenter the system pursuant to a petition to modify and another disposition when a parent again failed to provide the stable and secure environment to which the child is entitled." (Ibid.)
The history discloses the mother initially came before the court because of excessive use of alcohol and evidence that she was not properly supervising her children. Based on this evidence the children were adjudged dependent children but allowed to remain in the mother's home. In addition, the court had the evidence concerning the drinking on February 11, 1989, and the lack of proper supervision on February 14, 1989.
Finally, at the initial disposition hearing on April 4, 1989, the court had before it not only the prior history but current evidence from the mother's therapist, Dr. Lord, that she had become delusional and out of touch with reality. The court also had the opinion of Dr. Brumfield, her psychiatrist, who felt she was psychotic and incapable of being a parent. It was his opinion that the children remain in foster care.
Apparently not content to rely entirely on these reports, the court ordered an evaluation by a psychologist Dr. Luftig, a doctor seen by the mother a year earlier. In making its order at the final hearing on May 9, 1989, the court referred to Dr. Luftig's testing and opinions. It was Dr. Luftig's opinion that the mother was only following the reunification plan in order to get her children back. It appeared to Dr. Luftig that the mother never accepted that she had a drinking problem. He stated that Claudia *1490 would have difficulty in handling "unstructured, ambiguous situations" without the involvement of the court and child protective services in providing external structure.
Based upon the history, the evidence of the events on February 11 and 14, 1989, and the opinions of the therapists, substantial evidence supports the decision by the court that a substantial risk of detriment existed if the children were returned to the mother's home.

DISPOSITION
The findings and orders appealed from are affirmed.
Todd, J., concurred.
WIENER, Acting P.J.
I concur in the result and in most of the discussion in the majority opinion. I write separately to emphasize that I do so under the compulsion of this court's recent decision in In re Lamonica H. (1990) 220 Cal. App.3d 634 [270 Cal. Rptr. 60]. Lamonica H. holds that a parent's agreement to have a juvenile court proceeding tried by a lawyer acting as a temporary judge rather than a referee  thereby waiving the right to review by a superior court judge  may be inferred from the parent's attorney's conduct. If the attorney's conduct can inferentially bind the client, I see no way we could conclude that the attorney's execution of written stipulation would not similarly bind the client.
It is true Lamonica H. does not cite or discuss the more general authorities which address the question of the attorney's ability to bind the client. (See, e.g., Blanton v. Womancare, Inc. (1985) 38 Cal.3d 396 [212 Cal. Rptr. 151, 696 P.2d 645, 48 A.L.R.4th 109]; In re Marriage of Helsel (1988) 198 Cal. App.3d 332 [243 Cal. Rptr. 657].) The parent's Blanton-based argument in this case, however, is necessarily premised on the requirement in California Rules of Court, rule 1416(a)(2) that the parent be advised of the right to review of any decision made by a referee not sitting as a temporary judge. The implications of that rule in terms of the importance of the right to review were before the court in Lamonica H. and deemed insufficient to warrant a different result. While I might have decided Lamonica H. differently had the issue been before me as a matter of first impression for *1491 this court,[1] I see no way of reconciling Lamonica H. with a conclusion other than that reached by the majority here. Accordingly, I concur.
NOTES
[*] Assigned by the Chairperson of the Judicial Council.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] All rule references are to the California Rules of Court.
[3] Although Claudia cites rule 1417(a)(2) she actually quotes former rule 1416(a)(2) which provides in part: "Juvenile court proceedings heard by a referee shall be conducted in the same manner as juvenile court proceedings heard by a judge, except:

".... .... .... .... .... . .
"(2) Prior to the conclusion of the hearing, in addition to any other information or advice to the child and parent or guardian required elsewhere in these rules, the referee shall inform the child and parent or guardian that the hearing is being held before a referee and not a judge and that there is a right to seek review by a juvenile court judge of any order of a referee."
[4] By letter dated February 2, 1990, the attorney representing the minors supports the finding and conclusion of the court and urges affirmance.
[1] My concern with Lamonica H. is that it allows a referee to simply ignore the requirements of rule 1416(a)(2). Under Lamonica H., if the parties do not object to the lack of an advisement, the appellate court will infer an agreement that the referee was to act as a temporary judge, making the advisement unnecessary. (See 220 Cal. App.3d at pp. 647-648.) If they knew enough to object, obviously the lack of an advisement was not prejudicial. A court's perception that an advisement is unimportant cannot, in my mind, override the Judicial Council's necessarily contrary view expressed by the adoption of the rule.