[No. D028003. Fourth Dist., Div. One. Nov. 20, 1997.]

In re TANIS H., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
KAINE H., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*This opinion is certified for publication with the exception of parts II, III, IV, and V.

**COUNSEL**

Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, Kathryn E. Krug and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.

Carol Archer, under appointment by the Court of Appeal, for Minor.

**OPINION**

**NARES, J.**—In this juvenile dependency matter, Kaine H. (the father) appeals from the jurisdictional and dispositional findings and orders affecting his relationship with his now one-year-old child, Tanis H. The father contends (1) the court erred in denying his jurisdictional hearing request for presumed father status; and (2) the Welfare and Institutions Code[1] section 300 dependency petition was sustained in violation of his due process rights because it failed to give him notice of his alleged wrongdoing. The father also contends (3) the jurisdictional orders were not supported by substantial evidence; and (4) the dispositional orders were improper because (i) the court erred in removing Tanis from the father's custody under section 361, subdivision (b), rather than under section 361.2, subdivision (a), and (ii) the removal findings were not supported by substantial evidence. Finally, the father contends (5) the court abused its discretion in denying his request to place Tanis with the paternal grandfather. We affirm.

_____
[1] All subsequent statutory references are to the Welfare and Institutions Code unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

Tanis was born on October 6, 1996. His mother Katie M. had a history with the San Diego County Department of Social Services (Department) and the juvenile court dating back to 1994 when, as a result of mental illness, she tried to suffocate her five-month-old daughter Breanna M., who escaped death when a relative intervened and administered cardiopulmonary resuscitation.

Breanna was removed from the mother's care and became a juvenile court dependent in April 1994. Although the mother was charged with attempted murder, she pleaded guilty to the lesser felony charge of willful cruelty to a child and received six years' formal probation. The mother failed to reunify with Breanna, who was adopted by her maternal aunt.

The mother's second child Jacob H. became a juvenile court dependent in September 1995 after she became involved in several violent physical confrontations with her live-in boyfriend while she was pregnant with Jacob. The boyfriend beat, strangled and threatened to kill her.

When Tanis was born in October 1996, the mother was living with the father. She was identified as a "very high risk" mother due to her mental health problems and juvenile court involvement. During her pregnancy with Tanis, she was only superficially complying with her reunification case plan, she did not obtain prenatal care until her seventh month, and she lived with the father in a filthy, flea-infested apartment with six cats.

A few months before Tanis's birth the father had outstanding warrants for petty theft and burglary. The mother disclosed there were three men who could be Tanis's father. Tanis was removed from his mother's custody before he left the hospital. The father thus never physically received Tanis into his home.

The Department filed a dependency petition on Tanis's behalf pursuant to section 300, subdivisions (b) (failure to protect) and (j) (sibling abuse), alleging the mother had a mental illness which rendered her incapable of providing regular care to Tanis; she had attempted to suffocate Tanis's oldest sibling Breanna; she had failed to demonstrate insight into her problem; and she had failed to show sufficient improvement to reunify with Breanna or Tanis's other sibling Jacob. With respect to the father, the petition alleged he was unable to protect and supervise Tanis.

### A. *The Detention Hearing*

At the detention hearing the court found the Department had made a prima facie showing Tanis was a person described by section 300, subdivisions (b)

and (j); placed Tanis in a licensed foster home; and gave the Department discretion to detain the child with the paternal grandfather Michael H. (Mr. H.) if he received a positive home evaluation. Tanis's parents continued to reside together.

### B. *Paternity Testing and Initial Placement Issues*

At a hearing on October 29, 1996, the father submitted a signed admission of paternity, but Tanis's counsel and county counsel requested paternity testing, noting there were other possible fathers. The court continued the hearing and ordered blood testing for paternity determination. The court also amended the petition to add the name of "Kenneth R." as an alleged father, set a special hearing to determine the status and paternity of Kenneth R., and ordered that he be served with a copy of the petition and notice of the next hearing.

At the special hearing the court found proper notice had been given to Kenneth R., who did not appear. The parents renewed their request for Tanis's detention with the paternal grandfather Mr. H. The court set the placement issue for a contested hearing after Tanis's counsel and county counsel opposed the parents' request on the grounds the father's paternity had not yet been determined and there were concerns about Mr. H's suitability for placement.

The Department submitted a change of placement notice to the court indicating it planned to move Tanis from his foster home to the home of the maternal grandparents who were already caring for Tanis's half sibling Jacob H. Although the maternal grandparents had refused to accept Tanis for placement for many weeks, they changed their minds after a four-day visit with him.

The mother opposed Tanis's detention with his maternal grandparents, and the court held a special hearing at the request of the mother's attorney. The mother's counsel argued this detention placement was interfering with the reunification process. Counsel for Tanis supported the detention with the maternal grandparents because they were appropriate caretakers and they had been caring for Tanis's half sibling Jacob H. The court deferred the placement issue to the pending trial.

### C. *The Jurisdictional Hearing*

The court held the contested jurisdictional hearing on January 8 and 9, 1997. Both parents were present with counsel. The court found the father

was Tanis's "biological alleged father," but denied the father's motion that he be granted presumed father status based on the father's "Offer of Proof/ Paternity Questionnaire," which indicated he had not received Tanis into his home. The court entertained oral argument on whether the father had standing to participate in the jurisdictional hearing notwithstanding his lack of presumed father status. The court granted the father standing to participate based on his status as a biological father.

### 1. Documentary Evidence

The court received into evidence the screening summary and detention information report prepared by social worker Jill Hosmer; the social study prepared by Hosmer; an additional information report prepared for the hearing of October 29, 1996; an additional information report dated December 12, 1996, with attachments (including the disputed parentage study); and an additional information report dated December 23, 1996. The court also took judicial notice of the petition, findings and orders in the dependency case involving Tanis's half sibling Breanna M.

In the social study the Department detailed the mother's history as a molest victim, her arrest in August 1995 for a probation violation, her living with her abuser (Sam H.), and her failure to attend therapy. The social study also reported that the mother moved into paternal grandfather Mr. H's home, where she became involved with Tanis's father, and later moved into the home of Steven V., who told the social worker the father bragged about shoplifting with Russian children. The father had a son, Michael, who was born in 1993 and lived in Michigan, but the father did not pay child support. The father did not appear for the first scheduled visit with Tanis, but did appear for the second. Kenneth R. told the social worker he had been involved with the mother and could be Tanis's father.

The social study also indicated the paternal grandfather, Mr. H., received disability payments for "post-traumatic stress disorder" and for an injury received during the Vietnam War. Before February 1992 he drank and smoked marijuana heavily. He had experienced blackouts, and took medication for depression and insomnia. Although his home was clean, and he stated he liked to have neighborhood children come to his apartment, the social worker observed "explicit pornographic photos" on the bedroom wall. Mr. H. had been clean and sober since 1992, and was taking a course to become a chemical dependency counselor. He had a 1988 petty theft conviction, a 1990 conviction for disorderly conduct for "loitering around a toilet for the purpose of a lewd act" and being under the influence, and a 1992 conviction for possession of a controlled substance.

The additional information report prepared for the hearing on October 29, 1996, shows the father pleaded guilty to larceny in 1994 in Michigan, and was sentenced to two years' probation and a fine.

In the additional information report prepared for the hearing on December 30, 1996, the social worker reported that paternity testing results indicated the probability of the father's paternity was 99.62 percent. A letter from the mother's domestic violence counselor stated the mother rarely participated in group sessions and did not benefit from the counseling. The social worker had obtained a copy of a police report regarding an August 5, 1996, incident in which the father allegedly tried to cash a fake U-Haul payroll check in the amount of $435.87. The father was arrested. As of the date of the special hearing on December 11, 1996, a bench warrant had been issued on the father for failing to complete a shoplifters course and pay a fine.

In another additional information report prepared for the hearing on December 30, 1996, the social worker indicated that the paternal grandfather, Mr. H., had visited Tanis only once since the hearing on December 11, 1996. The social worker made an unannounced visit to Mr. H.'s apartment at noon on December 12, 1996, and learned that he was sleeping. She made another unannounced visit at noon on December 17, and again learned that Mr. H. was sleeping. The social worker was concerned about Mr. H's sleeping patterns, particularly in light of the fact he was medicated for sleeping problems and depression, and the demands of a baby required a caretaker who was awake and functioning in the daylight hours.

### 2. *Testimony*

The sole witness was the social worker, Jill Hosmer, who was assigned to the family violence program, a collaborative effort with the department of probation. She testified the mother and father had recently moved from their apartment because the mother reported they were two months behind on their rent and they did not want to be evicted. The mother had informed the social worker the father was residing with his father, Mr. H. Hosmer stated the father had not offered the mother support during her pregnancy with Tanis. The mother received some prenatal care and assistance with basic health issues and cleanliness only after Hosmer enlisted the services of a public health nurse who began going to the parents' home in July 1996.

### 3. *The Juvenile Court's Findings and Orders*

The court found the allegations in the amended petition were true by clear and convincing evidence, and sustained the petition under section 300,

subdivisions (b) and (j). The court noted the mother continued to suffer from depression, and the mother's participation in group counseling sessions had not been productive because the mother felt there was no reason for her to attend. The court found the mother did not seek prenatal care for Tanis until her seventh month of pregnancy, and there was no evidence to show the father took independent steps to seek prenatal care for his unborn child.

### D.   *The Disposition Hearing*

The contested disposition hearing was held on January 22, 1997.

### 1.   *Documentary Evidence*

The court considered the documentary evidence received at the jurisdictional hearing. The court received additional documentary evidence, including an additional information report dated January 15, 1997, in which social worker Hosmer stated paternal grandfather Mr. H. had only visited Tanis twice since he left the hospital. Hosmer stated she attempted to make a home visit at the mother's new address, but located her sleeping on a mattress in the middle of the living room of her old apartment, which was littered wall to wall with clothes, trash and debris. Hosmer reported the father was not there, and the mother reported "we're moving."

### 2.   *Testimony*

Hosmer testified that two or three weeks before the hearing the mother and father lived upstairs from Mr. H., and the father never informed her when he changed residences. She recommended that Tanis be placed with the maternal grandparents rather than with the paternal grandfather because she had worked with the maternal grandparents in their care of Jacob, they had been very cooperative with visits and keeping appointments, and Jacob had thrived in their home. She expressed concern that Mr. H. was being treated for depression and sleep disorder, he often seemed sleepy in the morning, and it was her opinion it would be hard for him, as a single person, to provide for a baby.

Mr. H. testified he first visited Tanis four weeks after Tanis left the hospital, and he was not able to visit Tanis until that time because he was not considered the grandparent. In anticipation of Tanis living with him, Mr. H. made daycare arrangements. During Hosmer's visit to his apartment he had a poster in his bedroom showing a man being orally copulated by a woman. At her request, he agreed to remove the poster. He stated he had no concerns about the care Tanis was receiving from the maternal grandparents, and it was good that Tanis was with his half brother Jacob.

Tanis's maternal stepgrandmother Laura M. testified she was willing to facilitate visitation with Mr. H. on any day except Sunday. She parented Tanis's mother Katie M. from the time Katie was 13 years old until she was almost 17.

### 3. *The Juvenile Court's Findings and Orders*

The court declared Tanis a dependent child under section 360, subdivision (d), and removed physical custody from the parents under section 361, subdivision (b)(1), based on its findings by clear and convincing evidence there was substantial danger to Tanis's physical health if he was returned home, and there were no reasonable means by which his physical health could be protected without removing him from his parents' physical custody. In stating its reasons, the court specifically noted Mr. H.'s testimony that he felt Tanis was receiving good care from the maternal grandparents, and that it was important for Tanis to know his half brother Jacob.

The court ordered Tanis placed with his maternal grandparents, noting that Tanis was in a stable and nurturing home, and ordered liberal unsupervised visits for the paternal grandfather with the Department having discretion to commence overnight visits with the concurrence of the child's counsel.

The court explained it did not have the authority to place Tanis with the paternal grandfather until the issue of the father's alleged paternity was established, and this was not done until the court received the paternity testing results. In the meantime, the court found it necessary to place Tanis in a setting other than foster care, and the maternal grandparents were available. The court also noted the care Tanis was receiving in the maternal grandparents' home was "more than appropriate." The court stated it had carefully considered the provisions of section 361.3, which governs placement with a relative when a child is removed from parental custody under section 361, and found that placement with the maternal grandparents was satisfactory under all of the factors listed in section 361.3.

### STANDARD OF REVIEW

This appeal challenges the sufficiency of the evidence. **(1)** The principles guiding our review of the juvenile court's resolution of factual issues are clear: " 'In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.] Those findings and orders may not be disturbed if they are supported by substantial evidence. [Citations.] As stated: "Issues of

fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] 'The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" [Citation.]' (*In re Samkirtana S.* (1990) 222 Cal.App.3d 1475, 1487 [272 Cal.Rptr. 489], disapproved on another point in *In re Horton* (1991) 54 Cal.3d 82, 92-93 [284 Cal.Rptr. 305, 813 P.2d 1335].) Further, at a dispositional hearing the court 'must undertake "a judicious appraisal of all available evidence bearing on the child's best interests" including an evaluation of the relative merits of alternative custody awards. [Citation.]' (*In re B. G.* (1974) 11 Cal.3d 679, 693 [114 Cal.Rptr. 444, 523 P.2d 244].)" (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733-734 [7 Cal.Rptr.2d 60].)

As this court has recently summarized: "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. (*In re Tracy Z.* (1987) 195 Cal.App.3d 107, 113 [240 Cal.Rptr. 445]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289.)" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [32 Cal.Rptr.2d 535].)

The juvenile court's broad discretion to determine what best serves a child's interests will not be reversed absent a clear abuse of discretion. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 [57 Cal.Rptr.2d 861].) As our Supreme Court has recently noted, the scope of that discretion is broad: "This determination was committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. (*In re Michael B.* (1992) 8 Cal.App.4th 1698 [11 Cal.Rptr.2d 290]; *In re Corey* (1964) 230 Cal.App.2d 813, 832 [41 Cal.Rptr. 379].) As one court has stated, when a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 421 [159 Cal.Rptr. 460]; see *In re Mark V.* (1986) 177 Cal.App.3d 754, 759 [225 Cal.Rptr. 460] [accord]; see also *Department of Parks & Recreation* v. *State Personnel Bd.* (1991) 233 Cal.App.3d 813, 831 [284 Cal.Rptr. 839].) And we have recently warned: [' "]The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' (*Walker* v.

*Superior Court* (1991) 53 Cal.3d 257, 272 [279 Cal.Rptr. 576, 807 P.2d 418], quoting *Shamblin* v. *Brattain* (1988) 44 Cal.3d 474, 478-479 [243 Cal.Rptr. 902, 749 P.2d 339].)" *(In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

DISCUSSION

I

*The Court Did Not Err in Denying the Father
"Presumed Father" Status*

■  The father first contends he met the two statutory requirements set forth in Family Code section 7611, subdivision (d), for obtaining "presumed father" status in that (1) he openly held out Tanis as his natural child, and (2) he received Tanis in his home by living with Tanis's mother while she was pregnant with Tanis. The father further asserts the court erred in denying his jurisdictional hearing request for presumed father status. We reject these contentions.

An unwed father's rights and duties under the Uniform Parentage Act of 1973 (UPA), adopted by our Legislature as Family Code section 7600 et seq., substantially depend on whether he is a "presumed father" within the meaning of Family Code section 7611. *(Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050-1051 [43 Cal.Rptr.2d 445, 898 P.2d 891] (hereafter *Michael H.*), citing *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 823 [4 Cal.Rptr.2d 615, 823 P.2d 1216] ["Whether a biological father is a 'presumed father' . . . is critical to his parental rights [in adoption proceedings]"] and *In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449 [24 Cal.Rptr.2d 751, 862 P.2d 751] [only "presumed fathers" are entitled to custody and reunification services].) The UPA provides a comprehensive scheme for judicial determination of paternity. *(Michael H., supra,* 10 Cal.4th at p. 1051.)

A man who has neither legally married nor attempted to legally marry the mother of his child becomes a "presumed father" under subdivision (d) of Family Code section 7611 if he *both* " 'receives the child into his home *and* openly holds out the child as his natural child.' "[2] *(Michael H., supra,* 10 Cal.4th at p. 1051, italics added, citing Fam. Code, § 7611, subd. (d).)

---

[2]Family Code section 7611, subdivision (d), provides in part:
"A man is presumed to be the natural father of a child if he meets . . . any of the following subdivisions:
"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .
"d) He receives the child into his home and openly holds out the child as his natural child."

In *Adoption of Kelsey S., supra,* 1 Cal.4th at pages 825-830 (hereafter *Kelsey S.*), the California Supreme Court held that an unwed biological father could not acquire presumed father status under Civil Code section 7004, subdivision (a)(4) (now codified without substantive change as Family Code section 7611, subdivision (d)) by means of "constructive receipt" of a child into his home. In *Kelsey S.,* a biological father who was not married to the mother was prevented by the mother, a court order, and actions taken by prospective adoptive parents from physically receiving his child into his home. (*Kelsey S., supra,* 1 Cal.4th at p. 825.) Opposed to the mother's plan to place the child for adoption, the father filed an action to establish his parental relationship with the child and to obtain custody of the child. (*Id.* at p. 822.) In rejecting the father's contention that he should be deemed the presumed father of the child because he did all that he could do under the circumstances to receive the child into his home, the court in *Kelsey S.* concluded that nothing in the language or legislative history of the statute indicated a legislative intent to provide presumed father status to a biological father based on the father's attempted receipt or constructive receipt of the child. (*Id.* at pp. 829-830.)

In *Michael H., supra,* 10 Cal.4th at page 1051, the high court clarified its earlier decision in *Kelsey S.* by stating that "to become a presumed father, a man who has neither married nor attempted to marry his child's biological mother must not only openly and publicly admit paternity, but must also *physically* bring the child into his home." (Original italics.)

It is thus clear under the *Kelsey S.* and *Michael H.* decisions that a father who fails to *physically* receive the child into his home does not qualify for presumed father status under Family Code section 7611, subdivision (d).

Here, the father did not qualify for presumed father status because his child, Tanis, was removed from the mother's custody before Tanis left the hospital and thereafter was never placed in the father's home. Because the father never physically received Tanis into his home, he did not satisfy the statutory requirements under Family Code section 7611, subdivision (d), for obtaining presumed father status.

The father has not cited any persuasive statutory or decisional authority (and we are not aware of any) to support his novel theory that his living with Tanis's mother while she was pregnant with Tanis constituted "receiv[ing] the child into his home" within the meaning of subdivision (d) of Family Code section 7611. Although the father correctly asserts that the court in *Kelsey S., supra,* 1 Cal.4th 816, and *Michael H., supra,* 10 Cal.4th 1043, "specifically looked to the father's assumption of parental duties *before* the

child was born," these cases do not support the father's theory that his living with Tanis's mother while she was pregnant with Tanis constituted "receiv-[ing] the child into his home" within the meaning of subdivision (d) of Family Code section 7611.

The court in *Kelsey S.* recognized there are two sources of law governing the rights and duties of unwed fathers in adoption proceedings: California's statutory scheme and the Fourteenth Amendment to the federal Constitution. Noting that under the statutory scheme a child's mother can unilaterally prevent the biological father from ever receiving the child into his home, and thus preclude him from obtaining the same legal right possessed by the mother to withhold consent to his child's adoption by third parties, the court in *Kelsey S.* held: ". . . [Civil Code] section 7004, subdivision (a)[3] and the related statutory scheme violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Kelsey S., supra,* 1 Cal.4th at p. 849, original italics.)

The *Kelsey S.* court emphasized the narrowness of its decision and stated, "The statutory distinction between natural fathers and presumed fathers is constitutionally invalid *only to the extent* it is applied to an unwed father who has sufficiently and timely demonstrated a full commitment to his parental responsibilities. . . ." (*Kelsey S., supra,* 1 Cal.4th at p. 849, original italics.) Thus, under the *Kelsey S.* decision the statutes governing presumed father status "are constitutionally sufficient when applied to a father who has failed to make such a showing. . . ." (*Id.* at pp. 849-850.)

In this context, the *Kelsey S.* court stated that in determining whether the unwed father has "sufficiently and timely demonstrated a full commitment to his parental responsibilities," a court should consider all factors relevant to

---

[3]For the sake of clarity, we reiterate Civil Code section 7004, subdivision (a), is now codified without substantive change in Family Code section 7611, subdivision (d) (discussed *ante*).

that determination, including "[t]he father's conduct both *before and after* the child's birth . . . ." (*Kelsey S.*, *supra*, 1 Cal.4th at pp. 849-850, original italics.) This language in *Kelsey S.*, however, cannot be construed to support the father's theory that his living with Tanis's mother while she was pregnant with Tanis constituted "receiv[ing] the child into his home" within the meaning of subdivision (d) of Family Code section 7611.

Our high court in *Michael H.* followed its earlier decision in *Kelsey S.* and held: "We conclude that an unwed father has no federal constitutional right to withhold consent to an at-birth, third party adoption under our decision in *Kelsey S.*, *supra*, 1 Cal.4th 816, unless he shows that he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child." (*Michael H.*, *supra*, 10 Cal.4th at p. 1060.)

The father here does not contend the application of Family Code section 7611, subdivision (d), is in violation of his equal protection and due process rights, and thus we need not reach the merits of the father's contention that the court erred in failing to review the father's actions with respect to Tanis before Tanis was born. In his reply brief the father continues to assert his meritless contention that "[a] review of the facts shows that [the father] did indeed physically bring Tanis into his home, albeit, prior to Tanis's birth."

We further conclude that even if the court did err in failing to consider the father's conduct before Tanis's birth to determine whether the father had "sufficiently and timely demonstrated a full commitment to his parental responsibilities," such error was harmless. There is no evidence to show, for example, that he sought to legally establish his relationship to Tanis, was assertive in seeking prenatal care for the mother (who did not receive such care until the seventh month of her pregnancy), or acted promptly and responsibly to clear the warrants for petty theft and burglary that were outstanding against him only a few months before Tanis's birth.

We thus conclude the court did not err in denying the father's request for presumed father status, and even if the court did err such error was harmless.

II-V*

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

*See footnote, *ante*, page 1218.

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Haller, J., concurred.