Filed 7/22/24  In re K.G. CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.G. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.G.,<br><br>Defendant and Appellant. | F087164<br><br>(Super. Ct. Nos. JD144754-00, JD144755-00)<br><br>**OPINION** |

### <u>THE COURT</u>[*]

APPEAL from orders of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Gino de Solenni, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Alexandria Ottoman, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]       Before Detjen, Acting P. J., Meehan, J. and DeSantos, J.

## INTRODUCTION

J.G. (mother) appeals from the juvenile court disposition orders declaring the children[1] K.G. (born in July 2014) and P.G. (born in February 2016) dependents of the court, removing them from mother's custody, and placing them with T.G. (father) under a family maintenance plan. We affirm the court's jurisdiction and disposition orders.

## FACTUAL AND PROCEDURAL BACKGROUND

*Juvenile Dependency Petition*

On June 20, 2023, the Kern County Department of Human Services (department) filed juvenile dependency petitions for K.G. and P.G., alleging they came within the provisions of Welfare and Institutions Code section 300, subdivision (b)(1).[2]

The petitions alleged K.G. and P.G. suffered a substantial risk of physical harm or illness as a result of mother's inability to provide regular care for the children due to her mental illness. The petitions alleged:

> "The mother frequently talks to herself and believes certain individuals are present when there is no other person there. The mother believes the father … is harassing her by driving through the alleyway behind her residence. The mother believes the father and the paternal grandmother are trying to kidnap the child and his sibling. The mother has regular incidents of waking up in the night and screaming. The children are awakened by the mother screaming but have learned to ignore the screaming and put themselves back to sleep. The mother believes she is working with a Federal Agent, 'Mr. Debbie.' On May 22, 2022, the mother was provided transportation to Mary K. Shell[3] to complete a mental health screening; during the screening, the mother stated she did not want nor need mental health services. The mother's untreated mental health places the children at risk."

---

[1] Mother has an adult daughter, S.G., who also lived in the home at the time of the dependency proceedings.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

[3] Mary K. Shell Mental Health Center (Mary Shell).

*Events Preceding June 22, 2023 Detention Hearing*

On July 29, 2022, the department received a referral alleging general neglect and the mother's absence on behalf of the children. The referral alleged that an inspection of the home found it " 'filled with soiled diapers, filth, trash, spoiled food, [and] cockroaches' " creating a situation where the children's health was in danger.

On July 29, 2022, social service worker (SSW) Salgado made contact with mother and children and toured the home, confirming the home was filthy. Mother blamed the dirty home on "laziness" but S.G., 17 at the time, reported mother possibly had mental health issues. K.G. and P.G. were removed from the home, and S.G. was released to her maternal grandparents.

On August 1, 2022, Salgado spoke with K.G., who has autism but is verbal, and P.G. Both reported their home was dirty, but stated they felt safe at home and their needs were met. P.G. reported that mother sometimes talks to herself, yells outside, and sees " 'bad people' " he was unable to see. Salgado then spoke to mother telephonically. Mother denied drug or alcohol use and stated she had been cleaning up the home. She reported prior domestic violence from father, and stated she had a restraining order in place, full custody of the children, and father had not lived in the home for a year.

On August 2, 2022, Salgado went to mother's home for an inspection, but mother did not answer the door because she overslept due to " 'being sick all night.' " A video inspection revealed the trash had been picked up and the home was cleaner. Mother agreed to participate in voluntary family maintenance (VFM) services and the children were released back to mother. The family received services from August 1, 2022, until the filing of the dependency petition on June 20, 2023.

On February 28, 2023, SSW Richard Murphy made an unannounced in-person visit to the home. The home was clean, with plenty of food and functioning utilities. Murphy asked mother if she received her mental health evaluation, and mother stated she

3.

should receive it in the next week or two.  Murphy told mother he wanted to see and review her evaluation before closing her VFM case.  Otherwise, no concerns were noted.

On March 28, 2023, SSW Vanessa Oqueli met in-person with mother.  The home's deck was littered with trash, cigarette butts and miscellaneous items.  Mother informed Oqueli that she would no longer participate in VFM services if the services exceeded six months.  Mother raised her voice and stated that Murphy agreed to close her case "this month."  Oqueli stated the department still needed confirmation on mother's mental health evaluation, and mother claimed she was evaluated at " 'Bakersfield Mental Health' " and was " 'cleared.' "  However, mother was unable to provide a date, who she spoke to, or the address of the location for the evaluation.

Mother stated she had a phone number for the location, but then started to show Oqueli car rental prices on her phone.  She was described as "easily distracted" and continuously changed the subject.  Mother stated that her car broke down and "the mechanic" was unwilling to fix it, and she could not walk to the mental health service provider because K.G. had congestive heart failure.  Oqueli told mother she would look into providing her and the children with bus passes.

Mother stated that father lives with paternal grandmother, and there is " 'domestic violence' " between father and paternal grandmother.  Mother then got upset and explained she did not understand why her case was still open, and claimed Murphy told her he was no longer going to conduct home visits.  Oqueli reminded mother multiple times that the department needed confirmation of her mental health evaluation before they would close the case.

Oqueli then tried to speak with K.G., who was lying on the couch under a blanket, wearing headphones and playing on a tablet.  He appeared clean and free of any marks or bruises.  Oqueli asked K.G. who lived in the home, and he pointed at mother, but would not answer any further questions.  As Oqueli tried to clarify if S.G. still lived in the home,

4.

mother said she no longer wanted to speak, stating, " 'You don't have your facts straight.' "

P.G. came into the living room, but kept his head down and would not answer any of Oqueli's questions. He was free from marks or bruises and returned to his bedroom shortly afterward. Oqueli conducted a walk-through of the home, which was messy, with stains on the floors and walls, and household items, clothing and trash scattered in every room. Mother claimed she had not cleaned in three days because she was trying to get her car fixed, but Oqueli noted the condition of the floor, kitchen stove, and bathroom did not appear to be recent. Mother became upset and stated that the condition of the home had "never been brought to her attention."

Mother complained about S.G., claiming that she behaved poorly and had issues at school. Oqueli asked mother about S.G. receiving mental health services, and mother said, " ' She won't go.' " Mother said she contemplated calling 911 about S.G.'s behavior. Oqueli told mother that her home was nonetheless mother's responsibility and concluded the visit.

On March 30, 2023, Oqueli called mother, who stated she was meeting with a federal prosecutor the next day, and that the children got out of school early that day. Mother asked to meet Oqueli the following Monday and stated that the home was halfway cleaned. Mother then explained that her children were victims of a crime, which is why she meets with a federal prosecutor "on a regular basis." She said, "they call the federal prosecutor 'dark knight' " but she would have to look up his name and contact information on her phone.

Mother also claimed to be a victim of domestic violence when she was with father. She said father continues to harass and stalk her. Oqueli recommended she file for a restraining order and asked about mother's confirmation of a mental health evaluation. Mother stated she was going in-person next week. She also stated that her car was fixed.

When asked what school S.G. goes to, the mother stated, " 'Discovery' " for independent study. Mother stated K.G. was born premature, which led to congestive heart failure, and received medication daily. Mother also stated K.G. suffers from high blood pressure. Oqueli thanked mother and concluded the call.

On April 4, 2023, Oqueli and SSW Graciela Garcia-Chandler met in-person with mother. The home was cleaner, more organized and free from clutter with the exception of S.G.'s room. Oqueli urged mother to clean S.G.'s room because leftover food and trash could lead to an infestation in other parts of the home. Mother stated that maternal grandmother has cancer and S.G. had been taking care of her, but she would speak with S.G. about cleaning her room.

Oqueli requested mother provide the department with confirmation of mother's mental health evaluation via email, and mother agreed. Mother stated she went to a location on "White Lane" for her evaluation, and showed Oqueli the location on her phone. The children did not want to speak with Oqueli but were clean and free from marks or bruises. Mother described a number of services she enrolled K.G. and P.G. into, and stated they were enrolled in summer school. Oqueli concluded the visit.

On April 25, 2023, Garcia-Chandler conducted an unannounced home visit. There was a lock on the front gate, and when Garcia-Chandler called mother, she stated, " 'You are not coming in here to take a look at my kids. You send me [Murphy] and don't bring [Oqueli].' " Mother stated, "a prosecutor and a federal agent" were on their way and terminated the call. After a few minutes, mother opened the front door and stated, " 'come inside now and look at these kids and make it quick' " three times. Garcia-Chandler stated she needed to make a phone call first, and after failing to convince her to enter, mother slammed the door.

Garcia-Chandler spoke with her supervisor with concerns about mother's behavior. Mother was not properly dressed, her hair was uncombed, and she appeared paranoid when coming outside. Garcia-Chandler was advised to complete a home call,

and after contacting mother by phone, entered the residence.  Mother requested Garcia-Chandler wear a face mask because one of the children was sick.  Mother had changed her clothes and her demeanor was different—she was soft spoken, respectful, and apologetic.

The home was somewhat organized and mostly clutter free.  The kitchen table was piled with items almost to the ceiling, however, and S.G.'s room was filthy.  Garcia-Chandler had an opportunity to speak with S.G. and informed her that she needed to clean her room and the mess was unacceptable.  S.G. stated she understood.  Mother stated that K.G. was sick and stayed home that day and was still taking medication.  P.G. was taking allergy medicine.  The children refused to speak with Garcia-Chandler.

Mother stated she had an evaluation at a mental health treatment facility, and the report should be emailed to "her worker."  Mother apologized for her previous behavior, stating that her children were sick and it was hot.  Garcia-Chandler noted it was not hot outside or inside the home, and multiple fans were turned on in the home.

Garcia-Chandler noticed a bruise on mother's arm.  Mother explained she was involved in a fight with her neighbor.  Mother also claimed she was being stalked by her ex-mother-in-law, and that is why mother does not go outside "without supervision," and why there was a lock on the gate.

On April 25, 2023, Garcia-Chandler received a text from mother, with a phone number for the " 'boys FBI agent' " and if anything happened " 'he is [to] take the boys ….' "

On May 11, 2023, Murphy received a text message from mother stating, " 'this dummyand his mother … just threatened to kidnap my babies and [Bakersfield Police Department] dispatch wont listen ur job help me protect them u need to have him arrested his address is ….  I have my boys federal agent he said to u text u I phone the judge myself too.  Thank you ….' " (*Sic*.)  Mother then texted " 'Im scared try to take boys

after school Im not crazy or bad mom just fighting domestic violence hard c[o]re.' "
(*Sic.*)

Murphy called the number for the FBI agent that mom had provided to Garcia-Chandler and left a voicemail. He also contacted the Bakersfield Police Department (BPD) dispatch, reported receiving a disturbing text message, and stated he was concerned about mother's mental state and the children. Murphy asked BPD to make in-person contact with him at mother's home.

BPD dispatch told Murphy that there were 18 calls for " 'disturbances' " from mother's residence since November 2022. Murphy waited several hours for BPD to respond, and ultimately approached mother's home after calling another social worker for assistance. Mother greeted them and granted them permission to enter the home. The home was relatively clean and well stocked with food. The children were playing on electronic devices and appeared healthy and well fed.

Murphy spoke with mother on the patio and asked her if she remembered sending a text message that father wanted to kidnap the children. Mother stated she knew what she texted and she was in contact with a federal agent. She gave Murphy the " 'Agent's' " phone number and Murphy called it and left a message. He voiced his concern that there may not be a federal agent assigned to mother, which she denied.

Mother stated she was upset about the possibility of the children being kidnapped. She also showed Murphy a photo of a bruise on her forearm, which she said came from her downstairs neighbor grabbing her arm a few weeks prior. Mother did not have a copy of her mental health evaluation and was waiting to hear back from the mental health center where she received it. She refused to sign releases of information for the department because she " 'didn't trust CPS.' " Murphy stated he would take mother for a mental health screening at Mary Shell the following day, and mother agreed.

On May 12, 2023, Murphy and SSW Yvonne Bermudez transported mother to Mary Shell for a screening. At the facility, Murphy was told there were no available screeners and to come back another day. Mother signed a release of information.

On May 22, 2023, Bermudez and social services supervisor Annie Stephens transported mother to Mary Shell again. When they approached the home, mother was sweeping the front deck, repeating, " 'mother[**]cker' " in an aggressive tone. Mother put the broom down, greeted them and welcomed them inside. While inside, mother rapidly changed subjects, requesting assistance with benefits and talking about K.G.'s performance in school. Bermudez told mother she heard her cussing as they approached the home, and mother interrupted and said she was speaking to her own mother on the phone.

Bermudez and Stephens conducted a home inspection. The home was relatively clean, although the walls were covered in dust and S.G.'s room was cluttered with trash and personal items. Bermudez and Stephens then transported mother to Mary Shell. During intake, mother answered "no" to a series of questions about her mental health. The intake specialist stated that because the mother did not check "yes" on any of the boxes, she would not be provided services. Stephens intervened and stated that mother had made alarming statements in the past that indicated she needed mental health services. Mother became frustrated and said, " 'I do not need or want mental health services!' "

After leaving Mary Shell, mother asked, " 'So what now, are you guys taking away my kids[?]' " Stephens said they were not, and mother said her children were not abused or neglected. She then rapidly changed the subject, saying she was raped and that is why her children were on a "federal watch data base." Mother claimed to be in contact with a federal agent called " 'Mr. Debbie' " who would not talk to the department because it is a "private matter." Mother said the last time she spoke with "Mr. Debbie" was on May 17.

9.

On May 25, 2023, Bermudez and Garcia-Chandler met with mother and completed an inspection of the residence. The home was clean and the walls were free from dirt. Mother commented, " 'you can go tell that B[**]ch Annie wipes don't work and that I had to scrub.' " Mother would not let either social worker speak with the children, and said they were only comfortable with Murphy. Garcia-Chandler convinced mother to let them try on another day and they ended the visit.

On June 12, 2023, Bermudez and SSW Todd Irvine completed an unannounced visit. The children and S.G. were all home for the summer. Irvine asked mother about her case plan. Mother's demeanor changed and she said, " 'I don't have a mental disability!' " Irvine indicated he was simply asking because he had no information about the case. Mother stated that the department was involved due to domestic violence and a dirty home. Mother also indicated she would be moving soon as she had a chance for housing where they help victims of domestic violence in Northern California.

Mother stated she has an order of protection against father and he cannot come near the children. Mother explained father had done nothing for the children and continues to harass her by driving up and down her alley. Mother stated she would yell and cuss at him to leave her alone when this happens. Mother also stated, " 'that b[**]ch downstairs' " was also harassing her, and that her "[mother-in-law] lives downstairs" and also frequently harasses her. Mother stated she calls law enforcement on father and mother-in-law frequently, once a week.

Bermudez spoke with S.G. alone in her room, which was still dirty and covered in trash. S.G. described the home situation as having " 'its ups and downs, but it has been better.' " S.G. said mother does not wake up " 'as much' " in the middle of the night to yell and scream. She said mother would wake up and start talking to herself then begin cussing. S.G. said it would happen a lot and would scare her, but she and her brothers learned how to put themselves back to sleep. The most recent time it happened was that week.

S.G. also said that no one was harassing them.  Mother would sit outside and talk to herself all the time.  Father had not been around or made contact with any of them for over a year.  S.G. said her brothers feel safe " 'as long as I am here .…' "  She said she watches over her brothers and ensures their safety but was planning on moving out soon.

Bermudez then tried to talk to P.G.  S.G. brought P.G. out of the bedroom, and mother grabbed P.G. by the arms and said, " 'They are not here to take you!  They are not going to take you!  You can talk to them!' "  P.G. hid behind S.G.'s leg, put his head down and would not speak with Bermudez.  Irvine asked mother if she felt she needed more support with her mental health.  Mother's demeanor changed and she said she had " 'two b[**]ches' " sit by her when she completed her screening, and "she did not know what more [the department] wanted."  She then called the mental health facility an " 'old fluff and fold place.' "

The social workers then spoke with S.G. alone.  S.G. stated she used to have suicidal thoughts and suffered a lot because mother did not care or empathize with her.  She had watched mother's mental decline for a "very long time" but she ensured her brother's safety by being present for them.  When asked how she would feel if the department was no longer involved, she responded with hesitation, things would be fine.

The petition was filed on June 20, 2023, and Bermudez was able to contact father for the first time on this date.  On June 21, the department contacted mother, who stated she had an appointment at another mental health facility on August 31, 2023.  The department also spoke with father, who requested placement of the children, and stated he would get a job to support them.  He stated he lives with his parents and brother in a three bedroom home.

Father said he left mother's home on June 15, 2021, because he could no longer tolerate mother's behavior.  She regularly called the police on him and made false rape accusations against him or stated that there was an emergency protective order issued

11.

against him.  Before leaving the home, the children would spend a significant amount of time with him because mother would spend the entire day outside.

*Prior Referrals*

On September 6, 2007, a referral was received alleging general neglect against the parents on behalf of D.G.[4] and S.G.  The referral alleged that the home was " 'nasty' " and the front yard was strewn with tools and dangerous equipment within reach of a toddler.  The referral was substantiated, the parents cleaned the home, and the referral was closed.

On February 16, 2016, a referral was received alleging general neglect against the parents.  In November 2015, at a doctor's visit to establish prenatal care for mother, their 15-month-old son was seen with multiple cuts and abrasions to his face and head, and father was repeatedly " 'verbally aggressive, offensive, and even threatening to the young boy.' "  In October 2015, mother was seen for arm and thigh pain and big bruises in those areas.  Mother stated she had tried to get access to a car that was put into gear from park by one of the children and rolled down a hill.  The referral was evaluated out.

On April 9, 2018, a referral was received alleging general neglect against mother on behalf of S.G. and P.G.  Mother had called her adult son and stated that her brother-in-law had entered her residence from the second story.  She sounded erratic and distressed, but then her demeanor quickly changed and she was not concerned.  BPD attempted a welfare check but received no answer at the door, and there were no signs of forced entry.  The brother-in-law was found to be working in Northern California at the time.  The department was told it was not unusual for mother to be " 'paranoid' " when father was not home, and she displays " 'bizarre' " behaviors from time to time.

On July 28, 2020, a referral was received alleging general neglect against the parents on behalf of K.G. and P.G.  Father was upset at mother because he believed she

---

[4]     D.G. is the eldest son of father from a previous marriage.

received his stimulus check and was yelling in front of the children. Mother also alleged father pushed her on the stairs and raised an open hand against her. Father denied any abuse. There were no arrests due to conflicting stories and no evidence.

On June 12, 2022, a referral was received alleging general neglect against mother on behalf of K.G. K.G. was found " 'saturated and soiled with urine' " because he refused to use the bathroom at school. When the reporting party spoke with mother, she said she knew that was going to happen because he did not use the bathroom that morning. K.G. seemed scared to use the school bathroom after he returned to school.

*June 22 and 28, 2023 Detention Hearing*

The juvenile court held an initial detention hearing on June 22, 2023, which was continued. Mother indicated she was concerned about K.G. because when he was removed, the department did not take any of his medical equipment with him. Mother also requested visitation or contact with the children, to which the court ordered visitation twice a week for two hours. The court then made a prima facie finding the children came within section 300, that there was a substantial danger to the physical health of the children or the children are suffering severe emotional damage, and there are no reasonable means to protect the children's physical or emotional health without removal. The court found reasonable efforts had been made and vested the department with temporary placement and care, custody and control of the children. The juvenile court held a continued detention hearing on June 28, 2023. The court ordered the children remain detained, ordered visitation for both parents, and ordered the parents back in court on July 27, 2023, and August 3, 2023.

*July 24, 2023 Social Study Report*

On June 22, 2023, SSW Keishaun Graig spoke with S.G. and mother. When S.G. started describing what was going on, mother immediately got defensive and started calling S.G. a "lying witch." Mother scolded S.G., who began to cry. Graig then asked to speak with S.G. alone.

13.

S.G. said that mother suffers from "mental health" and she talks to herself often. She stated mother had been talking to herself for many years and it is scary because mother uses an angry tone when doing so. S.G. said both she and the children are afraid of mother but have normalized her behavior. S.G. said mother would hit the wall repeatedly in the middle of the night for no reason, and then would go outside and talk to herself. Sometimes mother would stand in the doorway and stare out of the front door for long periods of time before going back to sleep. S.G. said mother has mood swings and she is bipolar and emotionally avoidant but denies it.

The previous summer, mother drove the children seven hours away to a domestic violence women's shelter, claiming domestic violence was happening in the home. S.G. said there was no domestic violence, and the only people living in the home at the time were mother, herself and the children. S.G. said her childhood was "not the best" and she wanted the best for her brothers, and when S.G. was younger she lived in a "trap house" with no electricity, gang members, and drug users.

S.G. said mother does not use drugs or alcohol, but smokes cigarettes a lot and only drinks iced coffee and cups of ice. Mother does not eat, and she and the children only ate "sometimes" and there were times when they would go to sleep hungry. S.G. said mother yells at them but did not use physical discipline.

S.G. said mother had previously told her that father had tried to rape her, and S.G. had not seen father since he left the home. She did not have concerns about father and felt her brothers would be safe with him but was unsure if she wanted to live with him. S.G. said she used to be suicidal and self-harmed, and begged mother for services, but mother never cared. S.G. said she fears that her brothers will not have a good life if they remain in mother's care while she is mentally unstable.

On July 11, 2023, mother sent SSW Adrianna Sautter a series of texts. Among them, mother said, " '[P.G.] fm [*sic*] are refusing to answer either number please know this is wrong.' 'Please remove [P.G.] to new home who can follow[] judges orders.' "

14.

Mother had called P.G.'s caretaker between 4:59 p.m. and 5:36 p.m. and had to be reminded to call after 6:00 p.m.

On July 13, 2023, Sautter met with P.G. In relevant part, P.G. said that things were fine at home with mother, but she would hallucinate. When asked what that meant, P.G. said she would stay up a long time and then she would see or hear things that were not there. It would usually happen at night, and it would wake P.G. up. When given the option to live with mother or father, P.G. said he wanted to go with father, because sometimes he was scared when mother saw things.

On July 15, 2023, Sautter met with K.G. and his caretaker. The caretaker voiced some concerns about K.G.'s behavior. Although K.G. was nine years old at the time, he frequently went to the bathroom in his diaper, which he refused to change. When he did go to the toilet, he would forget to wipe or clean up after himself. He would wear his diaper until the stuffing would come out, and would get defensive when confronted about his behavior. K.G. would also lie about everything, even when the caretaker could clearly see he was the one who misbehaved. He would throw tantrums and often hurt himself by scratching his face and legs, and was rude to adults. He would also wake up at night and sleep walk around the home.

When Sautter spoke with K.G., she did not observe any real emotion and when K.G. did not answer her questions, he would shrug and avoid eye contact. When asked if he wanted to live with father, he said he did not care. He said things were fine back home and he did not know why people were saying mother would "scream and act weird."

On July 17, 2023, Sautter met with mother, who said she had a substance abuse assessment on July 25th. She was also attending parenting classes. As of the preparation of the report, however, mother had not provided the department any progress reports or verification of enrollment. Mother had a mental health appointment scheduled on August 31, 2023.

*August 3, 2023 Jurisdiction Hearing*

The juvenile court held a jurisdiction hearing on August 3, 2023. Graig testified that the risk in this case was that the children reported they are afraid of mother due to mother's hallucinations. Mother talks to herself in an angry tone and the children do not know how to react or approach her. Sometimes mother is unable to provide care for the children because of her mental state. The children stated they were afraid of mother due to her waking up at night, and when mother was unable to get the children ready for bed or school, or prepare meals, S.G. had to help. Graig also stated that the department feels mother is in denial about her mental health, has declined mental health services in the past, and although she had an appointment coming up there was no indication she is actually participating in services.

Mother also testified. Mother stated that she did not have a mental illness, and was in counseling. Mother claimed she went back to Mary Shell, and "they" sent her to "a place on 22nd Street." Then "they" sent her to Sierra Vista to do a drug test and evaluation. There, mother spoke with a counselor, who she sees to work through problems, because she tends to "internalize a lot being a special needs mom."

Mother provided a letter from Mary Shell indicating where she should go for coordinated care, and a progress report for her parenting and child neglect classes. Mother stated that she speaks with both children, and that they say they miss her. She denied that the children were afraid of her and denied that she missed cooking them meals.

On cross-examination, mother was asked about a federal agent assigned to her. She responded that she has a friend who "works under … the money part." He calls and checks in. Mother stated that he was not a boyfriend, without being prompted. She was then asked why she believed that father was trying to kidnap her children, and she denied ever believing that or telling a social worker that he was trying to kidnap her children.

16.

Mother was asked about "Miss Debbie," and she said it was someone from "Fort Braggs" that "we" met in a domestic violence safe house. Mother explained "we" meant her and the children. Mother then corrected herself, saying their names are actually "Miss Denise and Miss Debbie" and they work for a domestic violence shelter in "Fort Braggs," eight hours away.

Mother denied K.G. ever said she sees people he does not see, and commented that "[y]ou have to remember, my son's autistic." Mother also denied that there were times she goes outside of the home and yells and talks to herself. She also denied father driving by the home, and said she mistook a neighbor's truck for father. Finally, mother denied sending any text messages to social workers about FBI agents, talking to herself, or waking up at night screaming.

The juvenile court ruled,

> "At this time, based on the mother's testimony, it's clear that in the house and in the world this is [mother's] version of what happens and then there's everybody else's version of what happens. And everybody else is consistent with each other … that the mother has hallucinations. She screams often. She's paranoid to the point for [P.G.] and [K.G.], they do feel afraid of her. They have learned to cope by going back to sleep when they hear stuff. But this fear is having an impact on them. While they may not have the insight of how it is impacting them, it is impacting them in the anxiety that [counsel] has described and in the conversations that … Graig said that she had with the children."

> "But also [S.G.], the other adult in the home, she talks about the impact that it has on the children; how she's fearful for them. She doesn't believe that they'll have a good life if they remain in the mother's care. I do believe if [S.G.] did not live in this home that these children would have been removed from the mother much sooner.

> "I do not believe that [mother] has any insight regarding her mental illness, regarding her blanket denials of everything that's been well documented in this case for almost a year; with her paranoia; her accusations that the father is harassing her; with the FBI agents.

"Additionally, it seems that she uses [K.G.'s] diagnosis of autism as a crutch as to that's what's impacting her mental illness, and that goes to her insight, and, so for those reasons, I do believe that her untreated mental health illness does place these children at risk and will sustain the allegation in the petition.

"[F]or the record, I did not find the mother's testimony to be credible. I did find … Graig's testimony to be credible.

The court takes the matter under submission."

The juvenile court then ordered a psychological evaluation by one doctor to determine what services would benefit mother. The disposition hearing was continued to September 5, 2023.

*Interim Hearings*

On August 15, August 28, and September 5, 2023, mother requested and was appointed new attorneys. On August 15, 2023, mother's attorney was relieved because mother filed a complaint against her with the State Bar, threatened to sue her, and was sending her emails that "don't make sense." On August 28, 2023, mother's attorney stated mother wanted him relieved before he ever spoke with her, because mother sent him an angry message that he did not "have a proper phone number so [he's] not a proper attorney." The matter was trailed and the attorney was relieved on September 5, 2023. The department was also concerned because mother was sending "a rash of e-mails" to the department and other uninvolved entities, including newspapers and a Senator. Mother would attach case records to these emails, and the juvenile court had to advise her not to send confidential documents to anyone who was not a party to the case.

On October 20, 2023, the juvenile court held a continued dispositional hearing on the psychological report prepared by Dr. Carol Matthews. Counsel for the minors requested a second psychological evaluation, because she believed Matthews's report was insufficient. Counsel argued the report did not reconcile mother's reported behaviors with the assessment that Matthews did.

18.

The juvenile court ruled that it did not have the authority to order a second evaluation when the first evaluation had come back, and showed mother was "capable and that she would benefit from services." The court then granted a continuance to review the report in whole due to its late submission. The report was not admitted into evidence and was not part of the record on appeal.

*October 19, 2023 Supplemental Social Study*

On August 15, 2023, Sautter documented a number of text messages from mother. On August 1, 2023, mother sent a screenshot of a text message from S.G. stating, " 'I don't want to spend the night.' " Mother said, " 'I called 911 all i [*sic*] can do[.]' " The message attached to the screenshot read " 'My daughter is up at [father's] spending the night is upset uncle and his friends being there. Please save my boys[.]' " On August 23, 2023, Sautter met with father, who denied that S.G. was uncomfortable or asked to go home that night.

Another series of messages from August 6, 2023, read, " 'I have requesteda new worker with more 10 yrs in dhs dept. which my law is allowed i have also email is ch[ie]f justice of kern county [email address] over no good lying dhs workers and false paperwork and id theft by both workers. You have until monday to get ur supervisor on this case and god bless ya[.]' " (*Sic.*) The following message read, " 'It is also illegally to sign in mother spot and for ms craig to be havin affair with my husband[.]' " (*Sic.*)

A review of the children's medical records revealed that K.G. did not have an enlarged heart or congestive heart failure but did have autism and high blood pressure. K.G. took medication for his autism.

On September 24 and 25, 2023, mother requested welfare checks on the children while they were at father's home, for no reason. On September 25, 2023, mother sent 17 text messages to Sautter which were mostly difficult to understand, but confirming she called the police. Mother again requested a welfare check on October 17, 2023, but she was described as " 'all over the place' " and the welfare check was not conducted.

19.

Mother's supervised visits with the children were otherwise positive and without incident.

On October 6, 2023, Sautter received a call from father, who stated that S.G. had called him. Mother had left S.G. at maternal grandmother's home and told S.G. she was going to live in a shelter because she had a $5,000 electric bill she could not pay. S.G. stated that mother was " 'up most of the night slamming doors and talking to herself.' " Sautter was not able to speak with S.G. before the disposition hearing.

On October 18, 2023, Graig spoke with mother, and confirmed mother had completed her parenting/child neglect classes on September 27, 2023. However, mother continued to state she did not have any mental health issues and did not need mental health services. She confirmed she was receiving counseling once a month, but would not discuss her progress. Mother also said she had only requested one welfare check because she received a call from a child who was screaming "help." She claimed the call was from a random number and she did not know the child.

*November 6, 2023 Disposition Hearing*

The juvenile court held a disposition hearing on November 6, 2023. Mother testified, but refused to elaborate about any mental health services she received. She stated she did not have to disclose her medical history and denied having any psychological problems. She stated the doctor she spoke with said she was a good candidate for reunification services. She denied being in contact with a federal agent and stated that the last time she was in contact was "[m]onths and months and months and years ago, honey."

Mother also stated that she had called welfare checks on the children because she had not heard from them in 24 hours and denied that she was doing it to "get back at" father. Father also testified, and stated he believed mother had some mental health issues. However, father also said mother does well with supervised visitation and he does not think she would ever harm the children.

The juvenile court ruled as follows:

"When deciding whether to remove from the custodial parent, the court has to ask whether there is or would be substantial danger to the physical health, safety, protection or physical or emotional well-being of the minor, and there are no reasonable means by which the minors' physical health could be protected without removal from the parent. And I do believe the department has met their burden in this case.

"When I look at Dr. Matthews' report, I don't give it that much weight. It's unclear to me how much weight or if she gave any consideration to the statements [S.G.] made to the social worker on June 22nd and whether she gave any weight to the statements that [P.G.] made to the social worker regarding both of them talking about the mother screaming in the middle of the night; how her—the hallucinations that she has; and how this screaming does at least have an impact on [P.G.] And those are his own words.

"With the mother continuing to deny mental health and even denying the symptomology that the people who lived with her for 24 hours, seven days a week—what they describe as her mental health symptomology and her denying that in the assessment with Dr. Matthews, I don't believe that it was a full, complete and honest assessment that the mother participated in.

"Again, when looking at the statements from the people who had lived with her and experienced the symptomology that the mother displayed, I give that a lot of weight. Again, we have [S.G.] who indicates the mother s[c]reams in the middle of the night; that she has hallucinations; that the children have learned to tune it out. But [P.G.] indicates in the jurisdictional report … he said that it was fine but the mother would hallucinate. I asked what he meant, and he said that she would stay up a long time and she would see and hear stuff that wasn't there.

"And then he further indicates that—later on … I asked him to explain why, and he said that sometimes he was scared when he—when his mother saw things.

"And I do agree with [counsel] that she does tend to present well. However, today in her testimony, we were able to witness an inability to focus, pressured speak, angry tone that [P.G.] talked about with his social worker. The mother just does not have insight about how her symptomology that the children witness and that [S.G.] witnesses has an

impact on them.  And without that insight, she's able to—unable to really address the goals of the case plan.  And because we have this blanket denial of the mental health symptomology that she's displaying, I do believe there is clear and convincing evidence that the children are at risk or substantial risk of suffering physical—but I think in this case, it would be emotional well-being of the minors.

"I do believe that the mother very clearly loves her children.  She would do anything to protect them.  I think that's what [father] was talking about, too.  But it's her own mental health symptomology that is putting them at risk.  They articulate being scared.  [S.G.] indicates she's worried about them if she wasn't there.  Without that acknowledgment or without addressing it, we're gonna be in the same situation that [father] has talked about.  It will continue to get worse.

"As far as dismissing to [father], I am not prepared to do that today.  I don't think he has a clear plan on how to keep … the children safe if it came to that.  I think he is learning from his parenting class.  However, I don't think we're at this point today where the children would be—I don't believe we would be giving this family recipe for success if we were to place and dismiss.

"I believe the mother has an opportunity to reunify with the children, and, eventually, the hope would be that we can have some shared custody with the children.  It seems that the children enjoy living with their father, but they very much also enjoy visiting with their mother.  I think in an ideal world they are able to split their time between their parents and enjoy a life with both of them not together but separately."

The juvenile court adjudged the children dependents of the court pursuant to section 300, subdivision (b) and ordered reunification services, mental health counseling and medication management for mother, and placed the children with father.

## DISCUSSION

### I.     Substantial Evidence Supports the Jurisdiction Finding

Mother argues neither of the children suffered serious physical harm or illness as a result of the allegations within the petition, and therefore substantial evidence does not support the juvenile court's jurisdiction finding.  We find substantial evidence supports

22.

the court's finding that the children are at risk of suffering substantial physical harm or illness and affirm the court's jurisdiction order.

## A. Legal Standard

The avowed goal of dependency law is to protect children who are physically, sexually or emotionally abused, neglected or exploited. (§ 300.) "The fundamental premise of dependency law is to serve the best interests of the dependent child." (*In re Samuel G.* (2009) 174 Cal.App.4th 502, 510.)

"At the jurisdictional hearing … [p]roof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300." (§ 355, subd. (a).) "Section 300, subdivisions (a) through (j), establishes several bases for dependency jurisdiction, any one of which is sufficient to establish jurisdiction." (*In re Dirk S.* (1993) 14 Cal.App.4th 1037, 1045.) In the instant case, the only basis alleged was "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] … [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1)(D).)

"[T]he circumstances under which the juvenile court is authorized to take jurisdiction of a child are narrowly defined." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) "The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm. [Citation.] 'In determining what constitutes a substantial risk of serious physical harm, some general guidance may be drawn from subdivision (a) of section 300, which uses the same language to authorize jurisdiction where "[t]he minor has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian." For purposes of that subdivision, "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury

was inflicted, a history of repeated inflictions of injuries on the minor or the minor's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm." [Citations.]' While evidence of past conduct may be probative of current conditions, 'the past infliction of physical harm by a caretaker, standing alone, does not establish a substantial risk of physical harm; "[t]here must be some reason to believe the acts may continue in the future." [Citations.]' " (*Ibid*.)

We review the jurisdictional findings of the juvenile court for substantial evidence. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.) "In reviewing the sufficiency of the evidence, our review requires that all reasonable inferences be given to support the findings and orders of the juvenile court and the record must be viewed in the light most favorable to those orders. [Citation.] Those findings and orders may not be disturbed if they are supported by substantial evidence. [Citations.] … 'Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] "The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact." [Citation.]' " (*In re Samkirtana S.* (1990) 222 Cal.App.3d 1475, 1487.)

### B. Analysis

To sustain the juvenile court's ruling that the children come within the court's jurisdiction pursuant to section 300, subdivision (b)(1)(D), there must be substantial evidence of two findings—first, that mother is unable to regularly care for the children due to her mental illness, and second, as a result, the children have suffered or there is a substantial risk the children will suffer serious physical harm or illness. We address these factors in order.

24.

*Substantial Evidence of Mental Illness*

In enacting section 300, subdivision (b), the Legislature omitted any evidentiary requirements for proof of "mental illness," and likewise omitted a definition of the term. The appellate court in *In re Khalid H.* (1992) 6 Cal.App.4th 733, rejected the contention that a finding of "mental illness" requires a formal diagnosis, and declined to apply the definition of "mental illness" from other statutory provisions to section 300, subdivision (b). (*Khalid H.*, at pp. 736–737.)

Comparably, in *In re N.R.* (2023) 15 Cal.5th 520 (*N.R.*), the Supreme Court found that the term "substance abuse," also appearing in section 300, subdivision (b)(1)(D), does not take on its technical meaning. (*N.R.*, at p. 543.) The Supreme Court concluded " 'substance abuse' bears its ordinary meaning of excessive use of drugs or alcohol, and that substance abuse by a parent or guardian may be established without a professional medical diagnosis of current substance abuse or satisfaction of the pertinent DSM[5] criteria. In so holding, we recognize that a professional diagnosis, or evidence bearing upon whether DSM criteria have been met, may be helpful in evaluating the existence of substance abuse at the jurisdictional stage of dependency proceedings or at another step in this process." (*Id.* at pp. 555–556.)

Relying on the principles discussed in *N.R.*, Black's Law Dictionary (12th ed. 2024) defines mental illness as: "1. A disorder in thought or mood so substantial that it impairs judgment, behavior, perceptions of reality, or the ability to cope with the ordinary demands of life; 2. Mental disease that is severe enough to necessitate care and treatment for the afflicted person's own welfare or the welfare of others in the community."

In this case, a mental health evaluation was not ordered until August 3, 2023, and the assessment by Matthews was not entered into evidence. Nonetheless, there was ample evidence at the August 3, 2023 jurisdiction hearing that mother was suffering from

---

[5] The Diagnostic and Statistical Manual of Mental Disorders.

a condition which impaired her perception of reality and affected her behavior and ability to care for the children.

The department first came into contact with mother and children when it received a referral for a home " 'filled with soiled diapers, filth, trash, spoiled food, [and] cockroaches.' "  In subsequent contacts, mother would claim that she was meeting with a federal prosecutor on a regular basis called " 'dark knight' " and a federal agent called "Mr. Debbie."  On one occasion, she told social workers making an unannounced visit that a "prosecutor and federal agent" were on the way; on another occasion she told social workers to call the " 'boys FBI agent' " and if anything happened " 'he is to take the boys ….' "  At the August 3, 2023 jurisdiction hearing, mother claimed she had a friend who "works under … the money part" of the FBI and otherwise denied sending any text messages about FBI agents to social workers.

On May 11, 2023, mother sent a disturbing text message to the social worker, saying father and paternal grandmother were threatening to kidnap the children, and that the federal agent told mother to contact the department.  At the August 3, 2023 hearing mother also denied sending this text message or believing that her children were going to be kidnapped.

On May 22, 2023, social workers observed mother sweeping the front deck of her home, repeating " 'mother[**]cker' " in an aggressive tone.  When confronted about it, mother claimed she was on the phone.  That day, mother was taken to Mary Shell and refused mental health services.

Mother also told social workers K.G. had congestive heart failure, which was later proven to be untrue.  Mother believed father was driving up and down the alley near her residence, harassing her, which was also untrue.

The children likewise described mother's mental illness.  P.G. told social workers that mother sometimes talks to herself, yells outside and sees " 'bad people' " he was unable to see.  S.G. told social workers that mother suffers from "mental health," and

26.

talks to herself often, in an angry tone, and that mother had been talking to herself for many years.[6] Sometimes, mother would wake up in the middle of the night, yell, scream, hit the wall repeatedly, or go outside and talk to herself. She would also stand in the doorway and stare out the front door for long periods of time and suffered from mood swings.

On one occasion, mother drove the children seven hours away to a domestic violence women's shelter, even though there was no domestic violence in the home, no one was living in the home other than mother and the children, and father had not been in contact with them for over a year. S.G. said mother would not eat, and the children only ate "sometimes," and would go to sleep hungry.

Mother regularly suffered from hallucinations and delusions which affected her perception of reality and led her to act erratically, such as regularly waking her children up in the middle of the night, calling social workers about kidnapping plots, and even driving long distances to get away from nonexistent domestic violence in her home. Her mental illness affected her ability to care for her children, evidenced by her struggle to keep her home clean, by depriving the children of sleep, and leaving them hungry. Mother suffered from these symptoms for years but continued to deny her behavior even at the August 3, 2023 jurisdiction hearing. These facts constitute substantial evidence supporting the juvenile court's finding that mother suffered from a mental illness which impaired her ability to regularly care for the children. (§ 300, subd. (b)(1)(D).)

*Substantial Evidence of Physical Harm*

"Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial risk* of *serious physical* harm or illness." (*In re Rocco*

---

[6]     A referral to the department from April 9, 2018, where mother hallucinated her brother-in-law breaking into her home, confirms this has been an ongoing issue.

*M.* (1991) 1 Cal.App.4th 814, 823, abrogated on other grounds in *In re R.T.* (2017) 3 Cal.5th 622.)

The department argues that it became involved in this case when it received a referral that mother's home was unsafe and " 'filthy.' " The department asserts that it is not speculative that dirty homes threaten the health, safety, and physical well-being of children, and can cause physical harm or illness and mother's mental illness impairs her care for K.G. and P.G., who are both special needs children, with K.G. needing medication multiple times a day.

In *In re Jeannette S.* (1979) 94 Cal.App.3d 52, the appellate court found substantial evidence supported the jurisdictional order, where the child was living in a "filthy" home. (*Id*. at pp. 58–59.) The report stated that the child was sent to school with clothes which were soiled with urine, not given breakfast at home, the home was filthy, and there was no adequate place for the child to sleep because of the clutter. (*Ibid*.) The mother suffered from mental illness, and had not provided a "stable mother role," although she was getting daily treatment and the child had a good and loving relationship with her. (*Id*. at pp. 56, 58.) The conditions of the home were not an isolated incident. (*Id*. at pp. 58–59.)

In this case, the home was similarly filthy to that in *Jeannette S.*, described as filled with soiled diapers, trash, and cockroaches, creating a situation where the children's health was in danger. During VFM between August 1, 2022, and June 20, 2023, mother struggled to maintain the home's cleanliness. Although the home was clean on February 28, 2023, on March 28, 2023, the home was again messy, with stains on the floors and walls and household items, clothing and trash scattered in every room. On April 4, 2023, the home was clean with the exception of S.G.'s room, but on April 25, 2023, it was again somewhat organized with the kitchen table piled with items almost to the ceiling.

In addition, S.G. reported that she and the children would only eat "sometimes" and would go to sleep hungry. Mother would scream at night, waking up the children, and engage in disturbing behavior such as hitting the walls, staring out of the doorway or walking outside and talking to herself. Unlike in *Jeannette S.*, mother in this case was not receiving mental health treatment and denied having any issues or that she engaged in disturbing behaviors in spite of evidence to the contrary.

Mother argues that the existence of a mental illness is not itself a justification for dependency jurisdiction over a child. Mother asserts that the children were well cared for during the time mother was receiving VFM services, and there were no reports about mental health issues in the children, or behavioral concerns.

Mother is incorrect. On June 12, 2022, the department had received a referral about K.G., who was found in school in a diaper " 'saturated and soiled with urine' " because he refused to use the bathroom. Mother said she knew that was going to happen. On July 15, 2023, when Sautter visited K.G. and his caretaker, the caretaker stated that K.G. was still using diapers and would wear them until the stuffing fell out. K.G. also displayed troubling behavior, throwing tantrums and hurting himself, and lying frequently.

While mother's mental illness is not itself grounds for dependency jurisdiction, the effect her mental illness had on the children—allowing the home to become filthy, disrupting the children's sleep and causing them to be afraid of her, leaving the children hungry, and failing to address the children's needs, in particular, K.G.'s behavioral issues—is substantial evidence the children suffered serious physical harm or illness. And mother's refusal to treat or even acknowledge her mental illness at the time of the jurisdiction hearing is substantial evidence that there is a substantial risk the children will suffer such harm in the future.

## II. Substantial Evidence Supports the Disposition Order

Mother argues there is not substantial evidence to support the juvenile court's finding that the children would suffer emotional harm if they remained in her care. Mother asserts that it is speculative that the children would suffer serious emotional harm if they returned to her custody. We find substantial evidence supports the court's finding that clear and convincing evidence shows the children would suffer substantial damage to their emotional well-being if they remained in mother's custody.

### A. Legal Standard

Section 361, subdivision (c) prohibits the removal of a child from the physical custody of his or her parent unless the juvenile court finds clear and convincing evidence of certain enumerated circumstances. In relevant part, a child may be removed if "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's [parent]." (§ 361, subd. (c)(1).) This standard is notably different from the jurisdictional hearing standard, both that it is a greater burden of proof, and that evidence of sufficient *emotional* harm may warrant removal from the parent's custody.

A removal order is proper if it is based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. (*In re Jeannette S.*, *supra*, 94 Cal.App.3d at p. 60.) The parent need not be dangerous and the child need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 536.)

" '[O]n appeal, the substantial evidence test is the appropriate standard of review. Thus, in assessing this assignment of error, "the substantial evidence test applies to

determine the existence of the clear and convincing standard of proof ….' " [Citation.]' " (*In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

### B. Analysis

It is true that mother's supervised visits with the children were positive and without incident. However, by the November 6, 2023 disposition hearing, mother's mental health had not improved in spite of her claim that she was regularly attending counseling.

Mother continued to send social workers difficult to understand text messages making unreasonable claims such as it was illegal for " 'ms craig to be havin affair with my husband.' " (*Sic*.) Likewise, a medical examination of K.G. revealed he did not have an enlarged heart or other heart issues, unlike what mother continuously claimed, which is especially concerning because it evidences mother's mental health issues extend to her perception of the children's medical needs.

Leading up to the hearing, mother called in multiple, unwarranted welfare checks on the children while they were in father's custody. She claimed that she received a phone call from a random number of a child she did not recognize yelling "help." Her behavior became so erratic that on October 17, 2023, she again called in a welfare check which was not conducted because of her demeanor being "all over the place."

At the hearing, the juvenile court described mother as having "an inability to focus, pressured speak, angry tone that [P.G.] talked about with his social worker." The court noted mother continued to lack insight into her symptomology and was therefore unable to address the goals of the case plan. This was evidenced by mother's refusal to speak about any of her mental health issues.

Because mother lacked insight into her mental health issues, continued to deny her mental health issues while engaging in irrational behaviors up to and at the November 6, 2023 disposition hearing, declined treatment and refused to speak about the counseling

she was receiving, it was reasonable for the juvenile court to infer that mother's behavior would continue unchanged.

That behavior includes screaming at night, hitting the walls, staring out of the doorway or walking outside and talking to herself, acts which the children said wake them up and scare them. Mother was acting this way as late as October 6, 2023. It includes failing to feed the children regularly, and believing, hearing, or seeing things that are not there. In particular, mother repeatedly believed domestic violence was occurring in the home when there was no one but herself and the children present. She believed father and paternal grandmother were harassing her. For over a year, she maintained that K.G. had a heart condition when he had none. She maintained a delusion that she was working with the FBI.

Mother would regularly act on these hallucinations. She drove the children seven hours north to a domestic violence shelter. She put locks on her gate and would call the police or text social workers about nonexistent harassment. While in mother's custody, the children's lives were directly and regularly affected and disrupted by mother's untreated mental health issues, to the point where they were afraid of her.

Therefore, substantial evidence supports the juvenile court finding clear and convincing evidence shows mother's mental health issues pose a substantial danger to the children's emotional well-being, and until mother is able to adequately treat her mental health issues there are no reasonable means by which the children's physical health can be protected without removing the children from mother's care.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.